TAX COURT MANAGEMENT OFFICE
(609) 815-2922
P.O. Box 972
TRENTON, NJ 08625-0972


## Corrected Opinion Notice

**7/25/2025**

**Joseph E. Bock, Jr., Esq.**

**Dominic Paul DiYanni, Esq.**

**From:  Shannon M. Tremel**

**Re:  Malka et al v City of Long Branch**
    **Docket number: 006918-2023**

The attached corrected opinion replaces the version released on 7/28/2025.

The opinion has been corrected as noted below:

   **Judge added a paragraph on page 4, after valuation.**






**TAX COURT OF NEW JERSEY**



MALA SUNDAR
PRESIDING JUDGE

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

July 25, 2025
**(Amended -see page 4)**

Joseph E. Bock, Jr., Esq.
Spiotti & Associates, P.C.
Attorney for Plaintiffs

Dominic Paul Di Yanni, Esq.
Eric M. Bernstein & Associates, LLC
Attorney for Defendant

     Re: Malka <u>et al.</u> v. City of Long Branch
       <u>Docket No. 006918-2023</u>

Dear Counsel:

This letter opinion decides plaintiffs' appeal of the judgments issued by the Monmouth County Board of Taxation, which left unchanged the $1,235,500 assessment imposed by defendant's assessor on each of two condominium units, 601 and 602, for tax year 2023. Plaintiffs contend that per their real estate appraiser's expert opinion, the value should be $990,000 and $900,000 respectively. Defendant, which filed a counterclaim, contends that per its real estate appraiser's expert opinion, the value should be $1,300,000 and $1,200,000 respectively.

Based on the credibility of the evidence provided, and as further explained below, the court finds the value of Unit 601 is $1,195,000, and of Unit 602 as $1,117,000.









## PROCEDURAL HISTORY

Plaintiffs own Units 601 and 602 (hereinafter "Subject Unit 601" and "Subject Unit 602," collectively "Subject Units") in a condominium complex, located in defendant taxing district, City of Long Branch ("City") and identified as Block 87, Lot 4.0601 and Lot 4.0602. For tax year 2023, the City's assessor assessed each Subject Unit at $1,235,300 (allocated $950,400 to land and $284,900 to improvements).

Plaintiffs petitioned the Monmouth County Board of Taxation ("County Board") challenging the assessments. The County Board issued judgments coded 2B ("presumption of correctness [of the assessment] not overcome") and left the assessments unchanged. Plaintiffs appealed those judgments to this court. The City counterclaimed.

At trial, each party proffered the testimony of a real estate appraiser, each of whom had authored a real estate appraisal report, as their expert witness, with no objection.

## FACTS

The condominium complex is located in the Resort Commercial zoning district (C-4), which features a mix of single-family homes, multi-family dwellings, apartment complexes, condominiums, and commercial properties. The building is a 11-story rectangular-shaped mid-rise condominium complex, with about 130 units, called Ocean Cove that was built in 1985. The layout are units which are "stacked." There are six such stacks on the north side, and seven on the south side of the building. There are ten residential floors, the penthouse being on the topmost floor. Each floor has 13 units.

2

The eastern side of the building faces the ocean, the western side faces the street, while the north and southern sides of the building face the city with some ocean views. Thus, the two sets of units on the west side of the building are least desirable since their view is of the street (Ocean Boulevard), while eastern most units are most desirable since they face the Atlantic Ocean. Plaintiffs' appraiser's report notes that "site is considered a beachfront, oceanfront and oceanside building." The City's appraiser also describes the complex's site as an oceanfront lot.

The complex has a range of upscale amenities, including a heated pool, fitness center, tennis courts, valet service, 24-hour security, concierge service, and indoor parking spaces for residents. Beach cabanas, owned by the residents of the complex, are also available.

The Subject Units are on the sixth floor (hence numbered with a 6, viz., Unit 601 and 602). The are on the north side of the building, with 1,830 square feet ("SF") of gross living area ("GLA"). Each has two bedrooms and two full bathrooms, and a small balcony with a partial ocean view.

Plaintiff, Mrs. Malka, a realtor, testified that plaintiffs have owned Subject Unit 601 since 2005, and Subject Unit 602 since 2012. She stated that Subject Unit 601 has upgrades, however, this is not so as to Subject Unit 602 where there was only minor maintenance (painting). The pictures of the interior show both Subject Units as being in a fair-to-good condition.

**VALUATION FINDINGS**

County board judgments are entitled to a presumption of correctness. MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (tax 1998). Any party challenging the same must initially overcome this presumption by presenting clear and cogent evidence. Id. Once the presumption is overcome, the party must prove by a preponderance of evidence what the value of the property at issue should be. Id. Here during trial, the court found plaintiffs overcame the initial burden. Therefore, it will proceed to examine the evidence for purposes of valuation.

Highest and Best Use

Both appraisers agreed that the highest and best use of the lot as vacant, is for development of a condominium complex, and as improved for its present continued use (residential high or mid-rise condominium complex). The court accepts their conclusion.

Valuation Methodology

Both appraisers agreed that the most reliable valuation approach is the sales comparison (or market) approach. The court agrees with their conclusion.

Choice of Comparables

Both used sales of units within the same condominium complex as comparables. Plaintiffs' appraiser used three sales:

|  | Penthouse (PH) 06 | Unit 612 | Unit 709 |
|---|---|---|---|
| Sale Price | $1,100,000 | $998,000 | $1,150,000 |
| Sale Date | 03/24/2022 | 04/30/2021 | 12/01/2021 |
| GLA | 1,207 SF | 1,830 SF | 1,730 SF |

She relied upon tax records, information from the multiple listing services (MLS), pictures of the interiors from other realtors, and other publicly available data as to sales of residences in the City.

The City's appraiser used four sales:

|  | Unit 401 | Unit 612 | Unit PH1 | Unit 914 |
|---|---|---|---|---|
| Sale Price | $1,550,000 | $998,000 | $1,475,000 (w cabana) | $1,300,000 |
| Sale Date | 05/03/2022 | 04/30/2021 | 04/20/2022 | 01/27/2023 |
| GLA | 1,830 SF | 1,830 SF | 1,830 SF | 1,830 SF |
|  |  | Sale also used by plaintiffs' appraiser | Estate Sale | Estate Sale |

He testified that he verified the bonafides of all comparables, including those sold by the estate of the owner, by discussions with the attorney and the realtor, respectively to confirm that they were marketed, and sold at arms-length.

The court finds the choice of comparables by both appraisers as credible since they were units within the Subject complex.[1]

Plaintiff, Mrs. Malka, testified that she, as a realtor, was involved with the sale of the City's appraiser's comparable one (Unit 401), and that it achieved a high sale price not only because it was gut-renovated at a cost of about $500,000,[2] but also because the sale

---

[1]  Per the City's appraiser, many units in the Subject Units' complex sold privately. There were 13 sales between 2021 and 2022, and after eliminating those which were one and three bedrooms, and those with an "NU" (nonusable) code, he used the balance four sales as his comparables.

[2]  It is undisputed that the comparable was gut-renovated. Plaintiff, Mr. Malka, testified to this. The City's appraiser's report included a permit request in 2017, for "alteration" of building, plumbing, and electrical, and for "interior remodel." It also included an approval of a zoning permit for "various interior condo revisions/modifications." The MLS pictures of this unit were dated 2017, and appear to be pre-renovation, thus when the

included personal property such as high-end furnishings. She did not have an itemization of the personal property and speculated their value as being about $100,000. The sale deed included in the City's appraiser's report does not include information as to inclusion of personal property. While her testimony raises an issue that the sale price may need allocation (realty and personal property), without more objective support, such as the contract of sale, or a mortgage deed, the court cannot reject the sale as a comparable. However, because the sale price of this unit is at the highest end of the range, thus, can unduly impact the value conclusion, the court will assign it a lowest weight as an outlier.

Adjustments to the Comparables' Sale Prices

The appraisers agreed that adjustments were warranted for time (market conditions); interior condition; and floor level (the higher the unit's level, the more is its desirability), but disagreed as to the quantum, and whether a one-or two-floor level difference merited an adjustment. The City's appraiser disagreed with plaintiffs' appraiser's additional adjustments for location, ocean view, and GLA difference.[3]

As further explained below, the court accepts the City's appraiser's adjustments as more credible, and applies them to the plaintiffs' appraiser's comparable sales. It rejects plaintiffs' appraiser's adjustments for location and ocean views.

1. *Market Conditions Adjustment*

---

property was sold on June 12, 2017, for $550,000 by the Mandel Group LLC, which purchased it from an estate since the sale was marked NU10.
[3] The City's appraiser provided a -$110,000 to his comparable three for the cabana.

Plaintiffs' appraiser's report included a graph based on which the appraiser noted that closed sales in December of 2021 indicated a price range of $1,200,000, which she opined was a substantial increase in value of condominium units from March 2021. Sales closed in March 2022 at a price range of $800,000, indicating "stabilization." The price range increased to about $1,200,000 in October of 2022, as it had in December of 2021, indicating a "rebound in the market." There was thus an "upward trend from March 2021 to December 2021, followed by a potential stabilization or correction in March 2022, and then a possible rebound in October 2022." Therefore, she adjusted only the sale price of her comparable 2 (Unit 612, which sold April 30, 2021) upwards by 20% per year (calculated from the contract date of February 2021, and for 10 months) or $166,500. She did not adjust the prices of the other two comparables.

The court's issue is that plaintiffs' appraiser's graph indicates the data used as the median list price. List prices can change, therefore, are not the best indicators of market conditions. This then renders questionable her conclusions as to market conditions. Further, the lack of adjustment for her other two comparables is problematic given her own conclusion that the market was at its peak in October 2022 - thus, her first comparable, which sold March of 2022, would have commanded a higher price as of October 1, 2022, as would her third comparable, which sold in December of 2021. The same should be the result for her comparable two, since per her own graph, an increase in market started in July 2022.

The City's appraiser's computation is more credible since he relied on data as to the median <u>sale</u> prices of waterfront condominium units in the City. Per that data, the market was on the rise at about 1% per month from September 2020 to October 2022. He testified that his comparable 3 (Unit PH1) had recently sold for $2,175,000, supporting his adjustment at about 1% per month. He thus made upward adjustments for his comparables two and three, and a negative adjustment for the fourth comparable since it sold in January of 2023. His adjustment for the commonly used comparable, Unit 612, was 17.06% (at roughly 1% for 17 months) of the sale price, thus $170,159. The court will accept this as to the commonly used comparable sale (Unit 612). Applying his 1% per month to plaintiffs' appraiser's comparables one and three, their adjusted sale prices are $1,168,530 (at 6.23% from sale date to assessment date for $68,530) and $1,265,000 (at 10% from the sale date to the assessment date for $115,000) respectively.

*2. Location Adjustment*

Only plaintiffs' appraiser provided for a location adjustment, which she testified was for proximity of a unit to the ocean. Her report explained the adjustment was because an ocean view was superior to street view. Her adjustments were in $20,000 increments.

She testified that the $20,000 quantification was supported by her paired sales analysis. She used two sets of paired sales. The first set comprised of sales in 2019:

| Unit No. | View | Date of Sale | Sale Price | GLA |
|---|---|---|---|---|
| 1011 | Oceanfront | 04/30/2019 | $1,100,000 | 1,850 SF |
| 1002 | 4 units from ocean | 01/15/2019 | $ 995,000 | 1,830 SF |

She attributed that $105,000 difference in the sale prices to location, divided the same by 4 (since Unit 1002 was four "units" from the ocean), for a per-unit adjustment amount of $26,250, which means, she concluded, "for each unit closer to the ocean front, you can expect an increase of $26,250." Therefore, the sale price of Unit 1002 (the second of the two paired sales) should be increased "by $26,250 to account for the difference in location between Unit 1011 and Unit 1002."

The second set comprised of two sales in 2014 with adjustments as follows:

| Unit No. | View | Date of Sale | Sale Price | GLA | Adjustment to Sale Price |
|---|---|---|---|---|---|
| 1008 | 2 units from ocean | 09/17/2014 | $650,000 | 1,730 SF | +$20,000 (100 SFx$200 per SF or PSF) |
| 812 | 1 unit from ocean | 03/18/2014 | $565,000 | 1,830 SF | +$80,000 ($40,000 per floor difference) |

The difference between the adjusted sale prices of the units was $25,000 ($670,000 - $645,000), which she opined was the per-unit amount due to location difference, i.e., "for each unit closer to the ocean front, you can expect an increase of $25,000 in the sale price."

Thus, she provided a +$20,000 adjustment for her first comparable which was apparently 5 units away from the ocean and on the south side of the building, as compared to Subject Unit 601 which apparently was "4 units away from the ocean," (5 units minus 4 units = 1 x $20,000). She made a -$60,000 adjustment for comparables two and three which were apparently "1 unit away from the ocean" thus superior to Subject Unit 601 (4 units minus 1 unit = 3 x $20,000).

As to Subject Unit 602, which she stated was apparently 5 units away from the ocean, she did not adjust the sale price for her first comparable which was also apparently

9

5 units away from the ocean. She adjusted comparables two and three by -$80,000 (5 units minus 1 unit = 4 x $20,000).

The court is unpersuaded that (i) a location adjustment is warranted; and (ii) the paired sales analysis is credible. The "premise" of a paired sales analysis is "that when two properties are equivalent in all respects but one, the value of the single difference can be measured by the difference in price between the two properties." Appraisal Institute, The Appraisal of Real Estate, 372 (15th ed. 2020). Thus, a paired data analysis must "be developed with extreme care to ensure that the properties are truly comparable and that other differences do not exist." Ibid. Thus, relying upon "pairs of adjusted prices" may be problematic since "the difference measured may not represent the actual difference in value to the characteristic being studied." Palisadium Management Corp. v. Cliffside Park Bor., 29 N.J. Tax 245, 272 (Tax 2016).

Here, as to the second set (2014 sales), the appraiser had to make several adjustments to render them "almost identical." The two units differed by more than one characteristic when the appraiser was attempting to derive a location adjustment. In other words, she is attempting to make them more identical than they actually are. It defeats the purpose of having a paired sales analysis if multiple adjustments are required to make the properties so similar for use in the paired sales analysis. Even if adjustments may be warranted (since it is difficult to find homes that are exactly or almost exactly the same except for one characteristic), the appraiser did not explain the basis for the $200 PSF

adjustment for GLA difference other than that "this represents properties of this type and quality construction."[4] While she computed the floor adjustment amount on a linear regression basis, the court is unpersuaded that the difference of two floors would command and increase of $80,000 in the sale price (see below for other issues the court has with her regression analysis). This leaves only one set of paired sales, and it is unclear whether the location adjustment would apply to the assessment date at issue here. The Appraisal of Real Estate, 372 ("Using only . . . pairing to draw conclusions can lead to a false impression, since there may be" other significant factors which "may impact value" hence "appraisers try to use several paired sales . . . to prevent an unknown factor from contributing to a misleading conclusion").[5]

The court finds more credible, the City's appraiser's opinion, that a unit located close to the street, versus one close to the ocean, would merit adjustments for location (i.e., proximity to ocean is superior since it provides ocean views), but not necessarily

---

[4] The City's appraiser's adjustment grid lists adjustment for GLA at $100 PSF. There was no explanation for this number. Note that all his comparables had the same GLA.

[5] For instance, the Monmouth County's MOD-IV information (Open Public Records Search System) shows the sale of Unit 1002 being marked NU7 (which include "[s]ales of property substantially improved subsequent to assessment and prior to the date of sale, and for which an added assessment has been or will be imposed." See N.J.A.C. 18:12-1.1(a)(7). The remarks section notes "substantially improved AA-300K" meaning that the property was (or would be) subject to an added assessment for tax year 2019 due to improvements. This can raise a question whether the difference in the sale price between Unit 1002 and Unit 1011 can credibly be attributable solely to their location, and on the same tenth floor. Plaintiffs' appraiser testified that she had relied upon tax and public records as one of her data sources, hence this footnote.

warranted based on the distance of a particular unit due to their ascending or descending unit number, since that does not prove better or superior ocean views because of the angle of view(s).  Nothing was provided to show that the Subject Units' ocean view was hindered due to being blocked by other buildings.  Further, the appraiser gave a separate adjustment for ocean view (see below), which makes the location adjustment (proximity to the ocean for ocean views) appear duplicative.  Therefore, the court is unpersuaded that adjustments are reasonable and warranted for location vis-à-vis ocean views.

*3. Ocean View Adjustment*

Only plaintiffs' appraiser provided adjustments for ocean view, which was for the view from the "terrace and the interior."  She deemed Subject Unit 601 to have a better ocean view (40%) but Subject Unit 602 to have a more inferior (20%) ocean view.[6]  Her report explained that "the view is estimated on a scale of 120% to 20%" with 20% representing a unit with a view of the street, and 120% representing a front-facing unit with a direct ocean view.  She quantified the adjustment at $40,000 "per 20% of the view."

The appraiser testified that the $40,000 quantification was supported by her paired sales analysis similar to the exercise she did for her location adjustment.  She used two sets of paired sales.  The first set, with adjustments, was as follows:

| Unit No. | Ocean View %adj. | Date of Sale | Sale Price | GLA | Adjustment to Sale Price |
|---|---|---|---|---|---|

---

[6] On the adjustment grid, the percentage is noted as 20% however, in the attached Explanation of Comparable Sales Adjustments, it is noted that the "subject unit has a 40% view."

| | | | | | |
|---|---|---|---|---|---|
| PH09 | 20% | 08/11/2021 | $1,550,000 | 1,730 SF | +$20,000 (100 SFx$200 per SF or PSF) |
| PH01 | 60% ("inferior") | 05/23/2022 | $1,475,000 | 1,830 SF | +$80,000 ($40,000 per floor difference) |

She computed the difference in sale prices as $95,000 ($1,570,000 less $1,475,000), noting "unit PH09 superior view selling for more than PH01 inferior view difference," and that the "view difference percentages = 40%" (60% for Unit PH01 minus 20% for Unit PH09). She then multiplied the 40% by $95,000 to get the percentage difference in dollars at $38,000, and then subtracted this from $95,000 for a final adjustment of $57,000. "This means" she stated, "the view is contributing to $57,000 of the $95,000 difference in sale prices."

The second set, with adjustments, was as follows:

| Unit No. | Ocean View %adj. | Date of Sale | Sale Price | GLA | Adjustment to Sale Price |
|---|---|---|---|---|---|
| 202 | 80% ("inferior") | 04/26/2018 | $512,000 | 1,820 SF | +$40,000 ($40,000 per floor difference) |
| 312 | 20% ("superior") | 03/22/2017 | $660,000 | 1,830 SF | |

She computed the price difference as $108,000 ($660,000 minus $552,000 = $108,000), noting that Unit 202 sold for less due to its "inferior view," and the percentage of view difference was 60%. The 60% quantified to dollars was $64,800 (60% of $108,000, the units' adjusted sale price difference). She subtracted this from $108,000 (difference in adjusted sale prices) for a "final adjustment" of $43,200, meaning "the view is contributing to $43,200 of the $108,000 difference in sale prices between Unit 202 and Unit 312."

Thus, and as to Subject Unit 601, she adjusted her comparable two by -$80,000, it being on the north side of the building "with a superior 80% view" (the math is presumably 120% minus 80% = 40% thus, there are two 20% adjustments, therefore $40,000 x 2). She made the same negative adjustment to her comparable three (which is located on the south side). She did not adjust her comparable one, which was on the south side but had an alleged 40% view, allegedly the same as Subject Unit 601.

As to Subject Unit 602, she made negative adjustments as follows: $40,000 to her comparable one, and $120,000 to comparables two and three. This resulted due to Subject Unit 602's alleged 20% ocean view.

The court agrees that a unit with an ocean view may warrant an adjustment as compared to a unit without such view. Quantification of the same can be accomplished ideally by a paired sales analysis. As noted earlier, the analysis is effective where the properties are "nearly identical properties except for one characteristic." Here, as she had with the location adjustment, the appraiser adjusted one of the sales by an arbitrary PSF amount to render it "nearly identical." This is an exercise which is properly done in a comparable sales analysis, not in a paired sales analysis. One sale in the first set, Unit PH01, sold with a cabana that the Subject does not have, thus merited a negative adjustment of $110,000 by the City's appraiser. See n. 3. It is unknown whether the other sales in the two sets had cabanas, and whether this made a difference to their sales price. These issues cast doubt as to the credibility of the resultant adjustment extraction.

14

Further, plaintiffs' appraiser's assignment of the 20% to 120% scale is arbitrary, as is the appraiser's measurement conclusion (one unit is a 20% worthy adjustment, another is 60%, and so on). See TD Bank v. Hackensack City, 28 N.J. Tax 363, 382 (Tax 2015) ("an expert's reliance on subjective measures for calculation and application of adjustments is unacceptable").

It is also unclear whether the percentage represents the quantum of ocean view a unit has, or whether it is simply a unit of measurement. Thus, does "80% inferior ocean view" mean the paired sale unit has an inferior view, therefore, needs a -80% adjustment (at $40,000 per 20% adjustment)? Does "20% superior view" mean that the paired sale unit has a 20% ocean view? And if 20% is at the low end of the scale (one with a street view per her report), how could it be a superior unit? See The Appraisal of Real Estate, 374 ("a mathematically precise yet logically meaningless" result should be avoided).

In any event, from the pictures in her report, the court could discern no difference as to an ocean view from the interior of Subject Unit 601 and her comparables two and three.[7] While only the City's appraiser's report had an exterior view of Subject Unit 602 that showed a slightly lesser ocean view, no adjustment as computed by plaintiffs'

---

[7] A picture of the balcony of Subject Unit 601 as contained in plaintiffs' appraiser's report shows a view of buildings and rooftops. If one were to turn to the right, one can view a portion of the ocean. A picture of the interior of Subject Unit 601 shows a much larger view of a portion of the ocean as compared to the view from the exterior (balcony). The balcony picture of Subject Unit 602 shows only a City view. A picture of an exterior view as contained in the City's appraiser's report of Subject Unit 601 shows an even larger view of a portion of the ocean, while Subject Unit 602 has a lesser ocean view.

appraiser is warranted due to the issues explained. Additionally, from the picture of the "Subject Location" in plaintiffs' appraiser's report, it does not appear that the views are drastically different for units on the northern side of the building versus the southern side to merit the significant adjustments. As the City's appraiser's opined, the difference in ocean view if any, is statistically insignificant. The court is thus unpersuaded that adjustments opined by plaintiffs' appraiser are reasonable and merited.[8]

### 4. Interior Condition Adjustment

Both appraisers deemed the condition of Subject Unit 601 as superior to that of Subject Unit 602. Thus, plaintiffs' appraiser labeled Subject Unit 601's condition as "Average/Good" and Subject Unit 602's condition as "Average," while the City's appraiser labeled them as "Average +" and "Average-" respectively.

Both appraisers provided adjustments for the interior condition of their respective comparables and relied upon the available MLS pictures in this regard. The City's appraiser's comparable 4 was vacant when sold as reflected in the MLS pictures.

---

[8] Although plaintiffs' appraiser testified that all her paired sales were at arms-length, the Monmouth County's MOD-IV information (Open Public Records Search System) shows the sale of Unit PH09 as being marked NU26 (which include "[s]ales that for reasons other than specified in the enumerated categories are not considered to be between a willing, knowledgeable buyer, not compelled to buy, and a willing, knowledgeable seller, not compelled to sell." See N.J.A.C. 18:12-1.1(a)(26). The remarks section notes "buyer owns another unit in building - parties knew one another before sale." The same NU26 was given to the sale of Unit 312, the second sale in the second set. This can raise a question whether the difference in the sale price between these sales and their paired counterparts used can credibly be attributable solely to the extent of ocean view.

Plaintiffs' appraiser deemed her MLS picture-less comparable one, and comparable two as in "good" condition (meriting negative adjustments of $50,000 as to Subject Unit 601, and $80,000 as to Subject Unit 602), but comparable three as in Average/Good condition, similar to Subject Unit 601 (meriting no adjustment as to Unit Subject 601 but -$80,000 as to Subject Unit 602).

The City's appraiser testified that he used a PSF basis because (a) the permit for Unit 401 (his comparable 1) showed the estimated cost to build/renovate as $40,000; (b) his discussions with local builders revealed a construction cost as to Unit 401 at about $100,000, with architectural fees ranging from $75 to $100. Therefore, he stated, he chose $67 PSF for Sale 1 and $48 PSF for his Sale 2 as the basis for adjustment. However, he provided adjustments for his comparables three and four at 2.5% and 10% of their respective adjusted sale prices as to Subject Unit 601, and at 5% to 10% of the comparables' adjusted sale price as to Subject Unit 602.[9]

The court is unable to fathom the basis for plaintiffs' appraiser's numbers. Not so with the City's appraiser's quantification, which works out to be a percentage of the adjusted sale prices. Since both appraisers agree that an adjustment for condition is warranted, the court will use City's appraiser's percentages (except as to "Average-") as follows: As to Subject Unit 601: Good is 7.5%; Average is 2.5%; Average- is 5%. These

---

[9] The City's appraiser opined his comparable two as in "Good" condition, comparable three as in "Average" condition, and comparable four as in "Average -" condition (thus similar to Subject Unit 602).

adjustments will not change the City's appraiser's numbers except for his comparable 4 which will change to +$62,678. As to Subject Unit 602: Good is 10% and Average is 5%. These adjustments will not change the City's appraiser's numbers.

These percentages as applied to the plaintiffs' appraiser's comparables will provide the following amounts: As to Subject Unit 601, for her first comparable, it is -$87,640 (7.5% of its adjusted sale price of $1,168,530). As to Subject Unit 602, for her first comparable, it is -$116,853 (10% of its adjusted sale price of $1,168,530) and -$63,250 for her third comparable (5% of its adjusted sale price of $1,265,000).

5. *Floor Level Adjustments*

Both appraisers agreed that locationally, a unit on a higher floor level can sell for a higher price. Plaintiffs' appraiser opined that even one floor makes a difference in the market. The City's appraiser disagreed but conceded that high floor levels vis-à-vis the Subject Units location on the sixth floor can command higher sale prices.

Plaintiffs' appraiser used a linear regression analysis to arrive at an adjustment amount of $40,000 per floor. Thus, she reduced the sale price of her comparable three, which was on the 7th floor, by $40,000, and the sale price of her comparable one, a penthouse on the 11th floor, by $200,000.

The City's appraiser used percentages to reduce the adjusted sale prices of his comparables thus: 15% to his comparable three, a penthouse, thus -$233,179; and 5% to his comparable four, a unit on the 9th floor, thus, -$62,478.

18

The linear regression analysis, while mathematically impressive (and would have provided a lot more clarity had it been accompanied by the graph with the scatter plot and data points), is nonetheless unpersuasive. The appraiser provided a worksheet to explain the regression equation. She used five sets of sales, the floor numbers and sale price of each sale was the "data points" from which, her worksheet noted, one can "find the equation of the regression line," leading to an "adjustment amount per floor." Her computations were:

*Set One*

| Unit Number | Floor Level | Date of Sale | Sale Price | GLA |
|---|---|---|---|---|
| 606 | 6th | 10/16/2018 | $1,299,000 | 2,230 SF |
| 1006 | 10th | 04/06/2022 | $1,500,000 | 2,230 SF |

Data Points (6, 1,299,000; 10, 1,500,000)
Regression Equation for C is: $Y = 50,250X + 1,245,750$
Adjustment Amount: $50,250

*Set Two*

| Unit Number | Floor Level | Date of Sale | Sale Price | GLA |
|---|---|---|---|---|
| 312 | 3rd | 03/22/2017 | $660,000 | 1,830 SF |
| 902 | 9th | 09/12/2017 | $800,000 | 1,830 SF |

Data Points (3, 660,000; 9, 800,000)
Regression Equation for C is: $Y = 23,333.33X + 613,333.33$
Adjustment Amount: $23,233.33

*Set Three*

| Unit Number | Floor Level | Date of Sale | Sale Price | GLA |
|---|---|---|---|---|
| 303 | 3rd | 06/09/2022 | $ 950,000 | 1,830 SF |
| PH01 | 11th | 05/23/2022 | $1,475,000 | 1,830 SF |

Data Points (3, 950,000; 11, 1,475,000)
Regression Equation for C is: $Y = 65,625X + 773,125$
Adjustment Amount: $65,625

*Set Four*

| Unit Number | Floor Level | Date of Sale | Sale Price | GLA |
|---|---|---|---|---|
| 214 | 2nd | 10/02/2019 | $ 975,000 | 1,830 SF |
| 903 | 9th | 10/28/2019 | $1,300,000 | 1,830 SF |

Data Points (2, 975,000; 9, 1,300,000)
Regression Equation for C is: Y = 46,428.57X + 882,142.86
Adjustment Amount: $46,428.57

*Set Five*

| Unit Number | Floor Level | Date of Sale | Sale Price | GLA |
|---|---|---|---|---|
| 212 | 2nd | 07/20/2021 | $950,000 | 1,830 SF |
| 612 | 6th | 04/30/2021 | $998,000 | 1,830 SF |

Data Points (2, 950,000; 6, 998,000)
Regression Equation for C is: Y = 12,000X + 926,000
Adjustment Amount: $12,000

She averaged the above, and as rounded, applied $40,000 per floor level. She stated that "on average, for every floor level you go up, you can expect an increase of about" $40,000 (rounded) "in the sale price."

Regression analysis is a statistical technique that can be used "in the application of approaches to value." The Appraisal of Real Estate, 249. Its application "to comparable sales data is a natural and obvious extension of the traditional analysis of differences in the sale prices of comparable properties in the adjustment process." Ibid.

Under this analysis, "a mathematical equation can be derived to quantify the relationship between a dependent (outcome) variable and one or more independent (input) variables." Id. at 268. The dependent is usually the sale price or rent. Ibid. The independent variables are "usually broadly derived from" value-influencing factors such as "social, economic, governmental, and environmental." Ibid. While "the physical characteristics of the land and improvements" are also independent variables, they need

not be used if "all of the comparable properties and the subject property are identical in some physical aspect." Ibid.[10] Sometimes, "it is also necessary to include" sale dates as an independent variable(s) "to account for economic change over time." Ibid.

A simple linear regression model can be used "to estimate the influence of a particular characteristic with significant statistical reliability when an adequate supply of data is available." Id. at 249-50. This model "has one independent variable." Id. at 268. Whereas a multiple linear regression model has more than one independent variable. Ibid.

Plaintiffs' appraiser's linear regression equation does not explain the numbers, how they were derived, and what they mean. For instance, what does C stand for when she states, "regression equation for C is: Y ="? Presumably Y is what she is solving for (dependent variable) and X is the floor level (thus, the dependent variable). However, there is no graph or plot to understand the numbers following the plus sign: for instance, in the first set of sales, where she notes "Y = 23,333.33X + 613,333.33," is the 61,333.33 something derived from plotting the sale prices and floor levels? Without this, and viewing the numbers in a vacuum, the court is unable to decide whether her conclusions are accurate and reasonable.[11]

_____

[10] As an example, "all are stucco, all have two-car attached garages, or all are located on the interior lots of identical size." The Appraisal of Real Estate, 268.

[11] If one examines her adjustment amount exclusion, one can arrive at her adjustment amounts by simple math: dividing the difference in the sale prices by the difference in the floor count. For each set, this exercise shows as follows:
  Set 1 with 4 floor level difference: $1,500,000 - $1,299,000 = $201,000 ÷ 4 = $50,250

Other issues are whether the differences in the sale prices are reasonably isolated to the difference in floor levels. For instance, in Set One, there is a four-year time-gap between the sales, which raises the question whether the difference in their sale price is due to market conditions. Note that both appraisers agreed that market conditions were on the rise in 2020 to 2021, and per the City's appraiser, until October 2022. The first sale in the set (Unit 606) was marked NU7 due to substantial improvement after the assessment date (and as to which an added assessment of $500,000 was to be imposed), thus raising the question whether the difference in sale price could also be due to its inferior condition.[12] The second sale in the set (Unit PH01) included a cabana. See n.3. Thus, it may be possible that the unit on the tenth floor commanded a higher price for more reasons than just being on a higher floor. Sale 1 in Set Two (Unit 312) was marked NU26 (non-arms-length). See n.8. Sale 1 in Set Five (Unit 212) was marked NU 30 with remarks, "part of a package deal." See n. 12.

---

Set 2 with 6 floor level difference: $800,000 - $660,000 = $140,000 ÷ 6 = $23,333.33
Set 3 with 8 floor level difference: $1,475,000-$950,000 = $525,000 ÷ 8 = $65,625
Set 4 with 7 floor level difference: $1,300,000 - $975,000 = $325,000 ÷ 7 = $46,428.57
Set 5 with 4 floor level difference: $998,000 - $950,000 = $48,000 ÷ 4 = $12,000

[12] See Monmouth County's MOD-IV information (Open Public Records Search System) in this regard. As noted earlier, plaintiffs' appraiser stated to have reviewed all tax and public records. The City's appraiser's report included information from this website also as to his comparables.

Additionally, the court is unpersuaded that the market would be $40,000 per floor even if they differ by one or two levels. It is reasonable that the market would pay more for a penthouse (the top floor) or floors closer to the penthouse. Thus, the court does not accept plaintiffs' appraiser's floor level adjustments for her third comparable which was one floor higher than the Subject Units.

While the City's appraiser's adjustments are on a percentage, it is more reasonable since it is not based on flawed data. Therefore, the court will apply his 15% reduction to the penthouse comparables used by both appraisers, and the 5% adjustment to his 9th floor comparable three.

6. *Adjustments for GLA and Cabana*

As noted above, plaintiffs' appraiser's $200 PSF for GLA difference had no explanatory or justifiable basis. While the amount for the cabana inclusion is also subjective, it does require a reduction since it is an amenity the Subject Units do not possess, therefore, the court accepts the same.

Based on the above, the court finds as follows as to Subject Unit 601:

|  | Unit 401 | Unit 612 | Unit PH01 | Unit 914 | Unit PH06 | Unit 709 |
|---|---|---|---|---|---|---|
| Price w market conditions adj | $1,626,948 | $1,168,289 | $1,554,529 | $1,249,567 | $1,168,530 | $1,265,000 |
| Condition adj | ($122,021) | ($87,622) | $38,863 | $62,478 | ($87,640) | |
| Floor level adj | | | ($233,179) | ($62,478) | ($175,280) | |
| Cabana | | | ($110,000) | | | |
| Adjusted Price | $1,504,927 | $1,080,667 | $1,250,213 | $1,249,567 | $905,610 | $1,265,000 |

23

With most weight to the adjusted sale price of Unit 612, the commonly used comparable, it being on the same floor, with the same GLA as the Subject Unit, and then to Unit PH01, then to Unit 914, then to Unit 709, and least weight to Unit PH06 (due to the GLA difference) and Unit 401 (as an outlier), the court finds that the value of Subject Unit 601 is $1,195,000.

The court finds as follows as to Subject Unit 602:

| | Unit 401 | Unit 612 | Unit PH01 | Unit 914 | Unit PH06 | Unit 709 |
|---|---|---|---|---|---|---|
| Price w market conditions adj | $1,626,948 | $1,168,289 | $1,554,529 | $1,249,567 | $1,168,530 | $1,265,000 |
| Condition adj | ($162,695) | ($116,829) | ($77,725) | | ($116,853) | ($63,250) |
| Floor level adj | | | ($233,179) | ($62,478) | ($175,280) | |
| Cabana | | | ($110,000) | | | |
| Adjusted Price | $1,464,253 | $1,051,460 | $1,133,625 | $1,187,089 | $876,397 | $1,201,750 |

With most weight to the adjusted sale price of Unit 612, the commonly used comparable, it being on the same floor and with the same GLA as the Subject Unit, and then to Unit PH01, then to Unit 914, then to Unit 709, and least weight to Unit PH06 (due to the GLA difference) and Unit 401 (as an outlier), the court finds that the value of Subject Unit 602 is $1,117,000.

As Order reflecting the above conclusions will accompany this letter opinion.

Very Truly Yours,

_____/s/ Mala Sundar_____
Hon. Mala Sundar, P.J.T.C.

24